# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

JAN 15 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| JABARI MONSON and | ) |
| SAUDIA MONSON, | ) |
| | ) **2:19-MJ.0014 EFB** |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 1, 2018 to the Present Date _____ in the county of _____ Sacramento _____ in the

_____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Jason Bauwens
United States Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: /—15—2019

City and state: Sacramento, CA

_____
*Judge's signature*

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF US POSTAL INSPECTOR JASON BAUWENS

I, Jason Bauwens, being first duly sworn, hereby depose and state as follows:

### I.      INTRODUCTION AND AGENT BACKGROUND

1.      I am a Postal Inspector with the United States Postal Inspection Service

("USPIS"). I am currently assigned to the Sacramento, California office. My responsibilities

include investigating criminal violations of federal and state law, including illegal narcotics and

narcotics proceeds being sent through the U.S. Mail; money laundering; robbery and burglary of

postal employees and facilities; destruction of government property; theft/possession of stolen

U.S. Mail; mail and bank fraud; and identity theft crimes. I am a "Federal law enforcement

officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that

is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request

a search warrant.

2.      I have been employed as a federal law enforcement agent for over 15 years,

during which I have graduated from several federal training academies. In 1998, I graduated

from the National Park Service Law Enforcement Academy in Sylva, North Carolina, which was

a 10-week police academy. In 2003, I graduated from the National Park Ranger Integrated

Police Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia,

which was a 16-week police academy. Most recently, I graduated from the Criminal Investigator

Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, which

was a 12-week training program. Throughout my career, I have investigated over 1,000 cases

involving criminal violations of federal, state, and tribal laws. I have instructed hundreds of

hours of training related to the detection, identification, and investigation of narcotics trafficking.

I have testified in various federal and state court proceedings. I have participated in multiple

Title III wire intercepts regarding narcotics trafficking investigations and have worked with

numerous confidential sources.

3.      During my training, experience, and interaction with other experienced Postal

Inspectors, Task Force Officers, and other drug-trafficking investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug-related proceeds; and to communicate with other participants to accomplish such objectives. I have received specialized training and instruction in narcotics investigation matters including, drug interdiction, drug detection, money laundering techniques and schemes, and drug identification. I have participated in and led numerous investigations targeting individuals and organizations trafficking marijuana, methamphetamine, heroin, cocaine, LSD, steroids, and other controlled substances, along with narcotics proceeds. During the course of these investigations, I have become familiar with the manner in which drug traffickers conduct their illegal operations. I have written numerous search warrants related to drug trafficking investigations, drug proceeds investigations, and drug parcel interdiction.

## II.     PURPOSE

4.     The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.  Rather, I make this affidavit in support of an application for a warrant to search:

> (1) **2795 Midge Avenue, Merced, California 95340 (hereafter referred to as SUBJECT RESIDENCE 1), further described in Attachment A-1; and**

> (2) **189 South G Street, Merced, California 95340 (hereafter referred to as SUBJECT RESIDENCE 2), further described in Attachment A-2; and**

> (3) **a Gold BMW X5 SUV bearing Texas temporary paper license plate 873407F, (hereafter referred to as SUBJECT VEHICLE 1), further described in Attachment A-3; and**

(4) a White 4 door Honda Accord bearing a "Merced Honda" paper plate (hereafter referred to as SUBJECT VEHICLE 2), further described in Attachment A-4; and

(5) a Black four door Dodge Charger Texas temporary paper plate 990329F (hereafter referred to as SUBJECT VEHICLE 3), further described in Attachment A-5;

the seizure of the items described in Attachment B;

and,

a criminal complaint naming JABARI MONSON and SAUDIA LATIQUE MONSON,

For violations of:

a.   Title 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance);
b.   Title 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance).

## III.   TECHNICAL BACKGROUND

5.      Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for legal tender (i.e. currency created and regulated by a government.)  Digital currency exists entirely on the Internet and is not stored in any physical form.  Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Digital currency is not illegal in the United States and may be used for legitimate financial transactions.  However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

6.     Bitcoin (also referred to as "BTC") is a type of digital currency.  Bitcoin payments are recorded on a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity.  Individuals can acquire Bitcoin either by "mining" or by purchasing Bitcoin from other individuals.  An individual can "mine" for Bitcoin by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger.  Individuals are rewarded for this by being given newly created Bitcoin.

7.     An individual can send and receive Bitcoin through peer-to-peer digital transactions or by using a third-party broker.  Such transactions can be done on any type of computer, including laptop computers and smart phones.

8.     Bitcoin are stored in digital "wallets."  A digital wallet essentially stores the access code that allows an individual to conduct bitcoin transactions on the public ledger.  To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to an account number while the private key is like the password to access that account.

9.     Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

10.     Through the dark web or darknet, i.e. websites accessible only through encrypted means, individuals have established online marketplaces, such as the Silk Road, for narcotics and other illegal items.  These markets often only accept payment through digital currencies, such as Bitcoin.  Accordingly, a large amount of Bitcoin sales or purchases by an individual is often an indicator that the individual is involved in narcotics trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins.  Further, individuals who have received Bitcoin as proceeds of

4

illegal sales on Silk Road-like websites need to sell their Bitcoin to convert them to legal tender. Such purchases and sales are often facilitated by peer-to-peer Bitcoin exchangers who advertise their services on websites designed to facilitate such transactions.

11.     Dark web sites (such as Dream, Wall Street, and Silk Road 3.1) operate on "The Onion Router" or "TOR" network. The TOR network ("TOR") is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. TOR likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the TOR network. Such "hidden services" operating on TOR have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software designed to access the TOR network.

## IV.      SUMMARY OF THE INVESTIGATION

12.     I am an investigator on the Northern California Illicit Digital Economy ("NCIDE") task force composed of the USPIS, Homeland Security Investigations ("HSI"), the Federal Bureau of Investigation ("FBI"), and the Drug Enforcement Administration ("DEA"). As a function of this task force, investigators regularly purchase narcotics utilizing both digital and legal tender, from the persons operating and illegally selling narcotics from the "dark" portion of the internet and from various social media platforms. Investigators regularly conduct undercover purchases of narcotics in an effort to assist in identifying the suspects operating such illicit sites. Additionally, investigators routinely profile parcels within the US Mail stream, looking for links to dark web narcotics vendors.

13.     During this investigation, Federal Law Enforcement Officers have: (1) observed JABARI MONSON, SAUDIA MONSON and other co-conspirators place parcels containing

methamphetamine, cocaine and marijuana into the United States Postal Service ("USPS") mail system; and (2) conducted undercover purchases of cocaine, methamphetamine, crack cocaine and marijuana from online accounts operated by JABARI MONSON, SAUDIA MONSON and other co-conspirators. In doing so, JABARI and SAUDIA MONSON are:

    a.  Distributing controlled substances.

            i. Under 21 U.S.C. § 841(a)(1), "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

    b.  Conspiring to distribute controlled substances.

            i. Under 21 U.S.C. § 846, "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

## V.     FACTS ESTABLISHING PROBABLE CAUSE

### A.   *Case Beginning and Initial Marijuana Seizures*

14.     Beginning in early 2018, USPS staff at the Merced Post Office located at 2334 M Street, Merced, CA 95340 ("MPO") noticed that an African American couple regularly came into the MPO and mailed an unusually large number of domestic and international parcels. The parcels contained handwritten labels and the transactions were conducted in cash. The USPS staff believed the mailings were suspicious in nature and reported their findings to US Postal Inspectors.

15.     On March 2, 2018, an unknown individual mailed 14 parcels from the MPO, all of which were destined for international addresses. MPO staff noted the mailer of the parcels

was the regular customer who shipped the international parcels and believed the sender name and address on the parcels was fictitious and that the transaction was paid for in cash. MPO staff forwarded the 14 parcels to your affiant in Sacramento, CA. Upon inspection of the parcels, your affiant observed the parcels were destined for numerous countries, to include Russia, India, Great Britain, Northern Ireland, Philippines and Germany. The sender name and address on the parcels was listed as "Travis Mathis 1994 Pinehurst Ave, Merced, Ca 95341." Your affiant observed the return name on the parcels was fictitious and did not associate with the listed return address on the parcels.

14.     Based on my training and experience, your affiant knows persons who have a customer base all over the United States and internationally typically conduct some aspect of their business via the dark or clear portion of the internet. Your affiant is aware that persons engaged in online business who utilize the USPS for shipping business related products typically do not conduct such transactions in cash or utilize handwritten labels, as it is neither efficient nor cost effective. Based on the fact the customer paid with cash instead of utilizing cheaper and more efficient online/preprinted postage options like most businesses, the sheer volume of the mailings destined for addresses all over the world, and the fact that the sender name and phone number did not appear to be true and correct, your affiant detained the 14 parcels for further investigation.

15.     On March 8, 2018, suspecting the parcels contained non-mailable items, specifically narcotics, law enforcement conducted a border search on two of the 14 internationally bound parcels. One of the parcels was destined to Ireland and the other was destined to the Philippines. In the parcel destined to Ireland, a small amount of marijuana was located (14 grams gross weight) and in the parcel destined for the Philippines, numerous unique edibles containing a strong odor of marijuana were located (378 grams gross weight). The suspected marijuana infused edibles were very unique in nature, and appeared to be some sort of sample pack containing eight different types of homemade cookies and brownies. After the search of the two parcels, the remaining 12 parcels were placed back into the mail stream.

7

### B.      Vendor "bestbuymeds" Identified

16.      Following the search of the parcels, law enforcement conducted a search of the dark web marketplace called Dream, in search of vendors that sold marijuana infused, homemade edibles similar to the seized products.  As a result of the search, law enforcement located a vendor named "bestbuymeds" that sold processed marijuana, as well as a homemade marijuana edible sample pack that appeared to be identical as to what was seized in the parcels.

17.      Law enforcement observed vendor bestbuymeds joined the Dream marketplace on September 16, 2017.  The most recent Pretty Good Privacy ("PGP")[1] key provided by bestbuymeds was created on October 31, 2017 and has the email "gatoradeapple404@gmail.com" associated with it.

18.      On or about July 2018, law enforcement observed that vendor bestbuymeds was no longer active on the Dream marketplace.  Law enforcement observed that bestbuymeds was last active on May 31, 2018.  As of that time, bestbuymeds had over 800 customer reviews with a rating of 4.51 stars out of 5.0.

### C.      Vendors "Houseofdank" and "Houseofdank2.0" Identified

19.      Throughout July 2018, parcels associated with the same persons mailing the previously identified bestbuymeds parcels continued to mail items from the MPO.  Your affiant noticed now the persons mailing the parcels were conducting the mailing of international parcels utilizing cash, but domestic parcels often contained preprinted labels with prepaid postage.  A check of USPS records and databases determined the postage on the domestic parcels were paid for utilizing Bitcoin via a third party online postage provider.  Suspecting the subjects behind the

---

[1] PGP is an encryption program that provides for authentication of data communications.  PGP generates a public key (to encrypt messages) and a private key (to decrypt messages), which allows users to send encrypted communications that can only be opened by the intended recipient.

bestbuymeds vendor account were likely operating under a new vendor name, case agents conducted a search of the Dream marketplace looking for their new moniker and identity.

20.     As a result, case agents identified a Dream vendor that was no longer active, which operated under the name of "Houseofdank."   Case agents observed that vendor Houseofdank joined the Dream marketplace on July 18, 2017 and was last active on September 16, 2017.  Case agents noted the date Houseofdank was last active was the same date bestbuymeds joined the marketplace.  During the time period Houseofdank was active, they earned approximately 450 customer reviews and a rating of 4.54 stars out of 5.0.  The PGP key associated with Houseofdank was created on August 6, 2017 and had the email "gatoradeapple404@gmail.com" associated with it, the same email as bestbuymeds.

21.     Case agents conducted additional research on the Dream marketplace and located an active vendor account under the name "Houseofdank2.0."  Case agents observed Houseofdank2.0 listed the same marijuana infused edibles for sale as those on the bestbuymeds vendor account, which matched those seized by law enforcement in March 2018.  Besides the marijuana edibles, Houseofdank2.0 offered for sale cocaine, pink methamphetamine, crack cocaine, MDMA, marijuana and marijuana edibles and concentrates in various forms.  The Houseofdank2.0 vendor account was created on May 24, 2018, which was within one week of when the bestbuymeds vendor account was last active.  A check of the Houseofdank2.0 PGP key confirmed it contained the same "gatoradeapple404@gmail.com" email as that of the other two vendor accounts.  Houseofdank2.0 claims to ship both domestic and internationally, and just like bestbuymeds, claims to have previously been a vendor on the on the now defunct AlphaBay marketplace.

22.     In July 2018, your affiant conducted a more detailed review of electronic postal records and databases, and identified over 200 domestic mailings using prepaid postage conducted by the suspects of this investigation, in May, June and July 2018 alone.  During the analysis, your affiant observed a majority of the parcels were mailed from the MPO or the Contract Postal Unit located within the Raley's Grocery Store located at 3550 G Street, Merced,

Ca 95340 (referred to hereafter as "Raley's"). In July 2018, your affiant began gathering surveillance images and video from both the MPO and the Raley's at various times the suspected narcotics parcels related to these vendors were being mailed.

23.     Your affiant reviewed surveillance video provided by Raley's during mailings of large numbers of parcels in this investigation that occurred on July 12th, July 20th and July 24th, 2018. In each of the three incidents of surveillance video, your affiant observed the same short, heavyset African American male with long black hair pulled back behind his head. Between the three days of mailings, the male subject, later determined to be JABARI MONSON, mailed over 70 parcels.

24.     Your affiant reviewed surveillance video provided by Raley's from August 20, 2018, when parcels related to this investigation were mailed. During a review of the surveillance video, your affiant observed that a taller, medium build African American female with black hair pulled back on her head, later determined to be SAUDIA MONSON, mailed over 20 parcels.

25.     Your affiant reviewed surveillance video from numerous mailings in this investigation which occurred on August 6th and August 9th, 2018 at the MPO. During the two days, three unidentified females mailed over 50 domestic and international parcels related to this investigation.

### D.     Undercover Purchase from Houseofdank2.0 on August 23, 2018

26.     On August 23, 2018, case agents placed an order from vendor Houseofdank2.0 on the Dream Market for 3.5 grams of crystal methamphetamine and 3.5 grams of marijuana. The purchase of the narcotics was paid for using Bitcoin. Case agents instructed the vendor to send the narcotics to an undercover address controlled by law enforcement. On August 31st, the parcel related to the undercover purchase was mailed from the MPO, along with approximately 16 others. The sender name on the parcel was listed as "KELLY BROWN 1708 POPPY HILLS CT MERCED CA 95340." An open source internet search and search of public records

determined the sender name on the package to be fictitious and not associated with the address. A search of the parcel in USPS records and databases determined the label on the parcel was purchased through a third-party vendor that sells postage online and accepts Bitcoin as payment. Law enforcement later opened the purchased parcel and observed two sandwich bags that were vacuum sealed in clear plastic. Inside one sandwich bag was a green substance that field tested positive for marijuana, and inside the second sandwich bag was a white crystalline substance that field tested positive for methamphetamine.

27. On September 6, 2018, case agents downloaded the surveillance video from the MPO that was associated with the mailing of the undercover purchase parcel on August 31, 2018. Case agents later conducted a review of the interior post office surveillance video and observed that an unidentified black female entered the post office carrying two large black trash bags filled with parcels. The unidentified female mailed approximately 18 parcels with prepaid labels affixed to them, including the undercover purchase parcel, all bearing the same fictitious return name and address. After mailing the prepaid parcels, the same female proceeded to mail numerous international parcels and paid for the transaction utilizing cash. Case agents then conducted a review of the exterior surveillance video present during the time the undercover parcel was mailed. During the review, case agents observed that at approximately the same time the unidentified female entered the post office carrying the bags of parcels, a gold BMW X5 SUV (later determined to be **SUBJECT VEHICLE 1**) was observed exiting the post office parking lot.

28. Your affiant later reviewed surveillance video from a mailing which occurred on August 30th, 2018 at the MPO. During the transaction, an unidentified black female mailed approximately 10 international parcels. During a review of the exterior surveillance video at the MPO, your affiant again observed at approximately the same time the unidentified female entered the post office carrying the bag of parcels, **SUBJECT VEHICLE 1** departed the post office parking lot.

11

### E.    Surveillance and Identification of Saudia and Jabari Monson

29.    On September 21, 2018, law enforcement conducted surveillance at the MPO parking lot. At approximately 4:23 pm, law enforcement observed a brown/gold BMW X5 SUV bearing Texas temporary paper license plate #873407F (**SUBJECT VEHICLE 1**) arrive at the post office lot. **SUBJECT VEHICLE 1** had a black plastic license plate frame that was empty and the paper temporary tag was visible in the center of the rear window. Law enforcement observed a black female exit **SUBJECT VEHICLE 1** and enter the MPO on foot. The female exited the MPO a short time later carrying a large stack of flattened boxes, which appeared to be the same size boxes used to ship a majority of the parcels identified in this investigation, and entered into the vehicle. Law enforcement initiated mobile surveillance on the vehicle as it departed the MPO and followed the vehicle until it parked in the driveway at 2795 Midge Avenue, Merced, Ca (**SUBJECT RESIDENCE 1**).

30.    After terminating the surveillance, law enforcement conducted a check of the registration on **SUBJECT VEHICLE 1**, which determined the Texas temporary tag was issued online on September 28, 2018 and was valid for a 3-day period. The registered name and address on the temporary tag was "SAUDIA MONSON 189 S G ST MERCED CA 95341" (**SUBJECT RESIDENCE 2**). Based on the registration information, the law enforcement surveillance team obtained a driver license photo of SAUDIA, and positively identified her as the person driving **SUBJECT VEHICLE 1**. Law enforcement conducted a check of public records databases and determined SAUDIA appeared to be married to a "Jabari Monson".

31.    Case agents conducted a search through public records databases and observed that JABARI and SAUDIA are both associated to address 189 South G St, Merced, Ca (**SUBJECT RESIDENCE 2**). Additionally, based on a search of public records databases, case agents determined SAUDIA is also simultaneously associated with **SUBJECT RESIDENCE 1**.

32.    Following the identification of JABARI and SAUDIA, your affiant conducted a review of numerous Merced Raley's and MPO surveillance videos downloaded earlier in this

12

investigation.  Based on the review, your affiant positively identified JABARI as the person

mailing the dozens of parcels from the Raley's on July 12th, July 20th and July 24th, 2018

(previously mentioned in paragraph 23).  In addition, your affiant conducted an additional review

of the Raley's surveillance video from August 20, 2018 and observed the female mailing the

parcels appears to be SAUDIA (previously mentioned in paragraph 24).

33.     Law enforcement conducted a review of Raley's surveillance video from

September 4th, 18th and 29th, 2018.  On each occasion, JABARI was observed mailing dozens of

parcels similar to the others identified in this investigation.

34.     On September 21, 2018, a member of the MPO staff took a picture of **SUBJECT

VEHICLE 1** as it was parked along the side of the MPO.  MPO staff later forwarded it to law

enforcement, in an effort to assist with identifying the mailers of the parcels.

35.     On October 1, 2018, a female entered into the Merced Raley's and mailed

numerous large parcels.  Law enforcement conducted a later review of Raley's surveillance

video from October 1, 2018.  As a result, law enforcement observed what appears to be SAUDIA

as the mailer the parcels.

36.     In October 2018, your affiant conducted a check of USPS records and databases,

and located a customer account that utilized the email gatoradeapple404@gmail.com the exact

email utilized in all previously mentioned vendor account PGP keys.  A further review of USPS

records and databases, linked the gatoradeapple404@gmail.com account to **SUBJECT

RESIDENCE 1**.  In October 2018, your affiant confirmed through USPS records that SAUDIA

and JABARI MONSON were receiving parcels in their names at both **SUBJECT RESIDENCE

1 and 2**.


F.      *Undercover Purchase from Houseofdank2.0 on November 3, 2018*

37.     On November 3, 2018, law enforcement placed an undercover purchase with

vendor Houseofdank2.0 on Dream Market, to purchase 3.5 grams of crack cocaine.  Law

enforcement instructed the target to send the narcotics to an undercover address controlled by law enforcement. On November 10th, the parcel related to the undercover purchase was mailed at the MPO. The sender name on the parcel was listed as "Jarvis Mithell 26 W 12th St Merced CA 95340," which was determined to be fictitious. The handwriting on the label of the parcel appeared to be nearly identical to the others identified in this investigation. Law enforcement later opened the parcel and observed a vacuum sealed bag which contained a small baggie of an off-white chunky substance. The substance field tested positive for Cocaine Base.

38.     Law enforcement conducted a later review of MPO surveillance at the time the undercover buy parcel was mailed. The parcel was mailed by another unidentified African American female at the MPO. The transaction was paid for in cash, and the parcel was shipped along with approximately 15 other domestic and international parcels.

### G.     Undercover Purchase from Houseofdank2.0 on November 4, 2018

39.     On November 4, 2018, law enforcement placed an additional undercover purchase with vendor Houseofdank2.0 on Dream Market for 7 grams of crystal methamphetamine. Law enforcement again instructed the target to send the narcotics to an undercover address controlled by law enforcement.

40.     Beginning on November 5, 2018, law enforcement began a multi-day surveillance operation, focusing on JABARI, SAUDIA and **SUBJECT RESIDENCES 1** and **2**, in an attempt to observe either of them mailing the two most recently made undercover narcotic purchases. During the November 5th surveillance, law enforcement observed a Gold BMW X5 (**SUBJECT VEHICLE 1**), a white Honda Accord with paper plates (**SUBJECT VEHICLE 2**), a black Dodge Charger with paper plates (**SUBJECT VEHICLE 3**) and a white Hyundai Santa Fe with Nevada License Plate 364D25, all parked at **SUBJECT RESIDENCE 1**. Throughout the surveillance, law enforcement observed SAUDIA and JABARI enter **SUBJECT RESIDENCE 1** on multiple occasions. Law enforcement observed SAUDIA and JABARI enter into

14

**SUBJECT VEHICLES 1, 2 and 3** on multiple occasions. On more than one occasion during the surveillance, law enforcement observed SAUDIA depart **SUJBECT RESIDENCE 1**, driving **SUBJECT VEHICLE 2**, and later conduct what appeared to be a hand to hand drug transaction. SAUDIA would stay in her vehicle while individuals on the street would walk up to her car, reach into her car window for a brief moment and then both would immediately depart the area. Each interaction lasted only seconds. On one occasion during the surveillance operation, law enforcement observed JABARI depart **SUBJECT RESIDENCE 1** driving the Hyundai Santa Fe SUV. JABARI drove to **SUBJECT RESIDENCE 2** (which is unkempt and appears to be unlived in) and parked the vehicle next to the residence but remained inside the vehicle. A short time later, an unidentified male driving a black truck arrived and parked near JABARI, exited his vehicle carrying a white plastic bag, and entered the passenger side of the white Hyundai Santa Fe driven. After approximately five minutes of being inside the vehicle with JABARI, the unidentified male exited the Santa Fe with the white plastic bag that appeared to now be full and departed in his black truck. JABARI then drove the Santa Fe over to the mailbox near **SUBJECT RESIDENCE 2**, checked the mailbox, and then departed the area. No mailings were conducted at the post office on this day and surveillance was discontinued at approximately 5:00 pm.

41.     On November 6, 2018, law enforcement again conducted a day of surveillance. No significant activity was observed.

### H.     Seizure of UC Methamphetamine Buy Parcel and 2 other Narcotics Parcels

42.     On November 7, 2018, law enforcement conducted a third consecutive day of surveillance. At approximately 1:29 pm, law enforcement performed a spot check of **SUBJECT RESIDENCE 1** and observed **SUBJECT VEHICLES 1, 2 and 3** parked in the driveway of the residence. At approximately 2:27 pm, law enforcement established surveillance in the parking lot of the MPO. At approximately 4:05 pm, JABARI arrived in the MPO lot driving **SUBJECT VEHICLE 2**. JABARI exited the vehicle and opened the trunk of the vehicle. An unidentified

15

African American female exited the passenger side, removed a small child from the vehicle and met JABARI at the trunk. JABARI removed a full black trash bag from the trunk and handed it to the unidentified female. The female and the child entered the MPO with the bag, and instead of waiting in the parking lot for the female, JABARI departed the post office lot. After being inside the post office for approximately 30 minutes, the female and child completed their transaction and exited the post office carrying small papers, presumably USPS receipts. Shortly after they departed the MPO, **SUBJECT VEHICLE 3** arrived in the lot instead of **SUBJECT VEHICLE 2**, and picked up the female and small child.

43.     Immediately after **SUBJECT VEHICLE 3** departed the lot, law enforcement entered the MPO and took custody of the 13 parcels (6 domestic and 7 international) mailed by the female. Amongst the 13 parcels was one parcel addressed to the undercover name and address utilized by law enforcement when conducting the November 4, 2018 purchase of 7 grams of crystal methamphetamine from vendor Houseofdank2.0. Law enforcement took custody of all 13 parcels for further investigation. The following day, law enforcement opened the parcel associated with the November 4, 2018 undercover methamphetamine purchase from Houseofdank2.0. Inside the parcel, law enforcement observed a vacuum sealed bag surrounding a Ziploc bag, which contained a light pink crystalline substance. The pink substance weighed 10 grams (weight including the Ziploc) and field tested positive for methamphetamine. The sender name on the parcel was listed as "Jennifer Jones 26 W 12th St, Merced, CA 95340" and was determined to be fictitious. The handwriting on the label appeared to be identical to the handwriting on the parcels previously observed in this investigation.

44.     Following the opening of the undercover buy methamphetamine parcel, law enforcement selected two of the international parcels from the previous day's mailings and conducted border searches of them. In a parcel destined to an address in England, law enforcement observed a bag of "LOL EDIBLES" branded medical cannabis candy, which advertised it contained 300 mg of THC. The weight of the item inside the bag was determined to be 65 grams. The product is one of the same products listed on the Houseofdank2.0 vendor

16

page. In the second international parcel searched by law enforcement, which was destined for an address in Australia, law enforcement observed it contained large pink crystalline rocks that were vacuum sealed in plastic, similar to the one seized from the undercover buy parcel. The pink rocks weighed 31 grams (weight including the Ziploc) and also field tested positive for methamphetamine. After seizing the three mentioned parcels, the remaining ten detained parcels were returned back to the mail stream.

## I.     *Undercover Purchase from Houseofdank2.0 on November 10, 2018*

45.     On November 10, 2018, law enforcement placed another undercover buy with vendor Houseofdank2.0 on Dream Market for 1 gram of cocaine. Law enforcement instructed the target to send the narcotics to an undercover address controlled by law enforcement. On November 19th, the parcel related to the undercover purchase was mailed from the Merced Raley's. The sender name listed on the parcel was listed as "Katie Douglas 14 W 12th St Merced CA 95341," which was similar to other addresses observed in this investigation and determined to be fictitious. The handwriting on the label of the parcel appeared to be nearly identical to the others identified in this investigation. Law enforcement later opened the parcel and observed a vacuum sealed bag which contained a ball of aluminum foil surrounding a Ziploc bag. Inside the Ziploc bag was a white chunky substance that field tested positive for Cocaine HCl. No surveillance video was obtained of the mailing.

## J.     *Vendor "Trapmart" Identified*

46.     On November 28, 2018, law enforcement conducted a review of the Houseofdank2.0 vendor account and observed all narcotics listing were removed from their account. Over the next week, Houseofdank2.0 continued to log in to the account even though they did not have any drug listings offered for sale. At the time of their last activity, the Houseofdank2.0 vendor account had 1000 customer reviews with a rating of 4.62 stars out of

17

5.0. Suspecting they opened a new vendor account like they had multiples times before, law enforcement conducted a search of Dream and located a brand-new vendor operating under the name "Trapmart." The opening line on the profile page of Trapmart indicated they were not new to dark web and were present on AlphaBay, just like previously mentioned in Houseofdank2.0's profile. They also mentioned they shipped both domestic and internationally. Law enforcement reviewed Trapmart's drug listings and observed they sold similar products as that of Houseofdank2.0 and a couple of the pictures posted to their page appeared to be identical photos as those listed by Houseofdank2.0. The Trapmart vendor account was established on November 29, 2018. The Trapmart PGP key was created on December 2, 2018 and had the email "verifiedprop215@gmail.com" associated with it. On December 6, 2018, law enforcement sent a private message to vendor Houseofdank2.0 from an undercover Dream account, asking about when they would be relisting their edibles again. Houseofdank2.0 responded to the undercover message stating "yes I will have edibles on my new page 'Trapmart'." As of the date of this affidavit, Trapmart has 150 customer reviews and a rating of 4.79 stars out of 5.0.

### K.    *Undercover Purchase from Trapmart on December 17, 2018*

47.    On December 17, 2018, law enforcement placed an undercover purchase with vendor Trapmart on Dream Market for 7 grams of crystal methamphetamine. Law enforcement instructed the target to send the narcotics to an undercover address controlled by law enforcement. On December 28th, the parcel related to the undercover purchase was mailed at the Merced Raley's. The sender name listed on the parcel was listed as "TONY WILLIAMS 3244 W SHAW AVE FRESNO CA 93711," a fictitious name and address previously observed in this investigation. The parcel was delivered to the undercover address as directed and law enforcement later opened the parcel. Inside the parcel law enforcement observed bubble wrap surrounding a layer of vacuum sealed plastic that further concealed a Ziploc bag. Inside the

18

Ziploc bag were clear crystalline shards that field tested positive for methamphetamine. The weight of the methamphetamine was determined to be 9 grams (weight including the Ziploc).

48.     Law enforcement conducted a later review of the Raley's surveillance video during the time the undercover buy parcel was mailed. Law enforcement observed JABARI enter the Raley's carrying a large trash bag filled with parcels. JABARI mailed the undercover methamphetamine buy parcel along with numerous other parcels.

### L.     Undercover Purchase from Trapmart on December 18, 2018

49.     On December 18, 2018, law enforcement placed an undercover purchase with vendor Trapmart on Dream Market for one ounce of marijuana. Law enforcement instructed the target to send the narcotics to an undercover address controlled by law enforcement. On December 19th, the parcel related to the undercover purchase was mailed at the Merced Raley's. The sender name and address on the parcel was handwritten and listed as "Lorenzo Garcia 2644 Glen Ave, Merced, CA 95341." On December 27th, your affiant took custody of the parcel prior to its delivery to the undercover address. Law enforcement opened the parcel and observed inside, an inner small flat rate USPS box that contained a layer of vacuum sealed plastic. Inside the plastic was 51 grams (weight with plastic packaging) of suspected marijuana.

50.     Law enforcement conducted a later review of the Raley's surveillance video during the time the undercover buy parcel was mailed. Law enforcement observed a young thin, unidentified African American male enter the Raley's carrying a large trash bag filled with parcels. The male conducted the transaction in cash and mailed the undercover marijuana buy parcel along with numerous other parcels.

### M.     Surveillance on December 20, 2018

51.     On December 20, 2018, law enforcement conducted surveillance of **SUBJECT RESIDENCES 1 and 2**. At the start of surveillance operation, law enforcement observed

**SUBJECT VEHICLES 1, 2 and 3** all present at **SUBJECT RESIDENCE 1**. In summary, throughout the surveillance, law enforcement observed JABARI and SAUDIA enter and exit **SUBJECT RESIDENCE 1** on multiple occasions. Law enforcement observed JABARI and SAUDIA both driving **SUBJECT VEHICLE 2**. In addition, law enforcement observed SAUDIA on four separate occasions, drive to different addresses throughout Merced, park in front of those residences in **SUBJECT VEHICLE 2** and conduct what appeared to be hand to hand drug transactions. In all four instances, SAUDIA stopped **SUBJECT VEHICLE 2** in the street in front of a specific residence and an individual would exit from the nearby house, reach into her open front window, and a couple seconds later the individual would walk back to the residence, at which time SAUDIA would rapidly depart the area.

### N.    Surveillance on January 11, 2019

52.    On January 11, 2019 at approximately 4:07 pm, law enforcement conducted a drive by of **SUBJECT RESIDENCE 2**. No vehicles were present at the residence and it still appears to be un-lived in. Your affiant conducted a check of a public records database, and confirmed JABARI and SAUDIA are still associated with the residence. Your affiant conducted a check of USPS records and databases and confirmed a parcel bearing JABARI'S name was delivered to the residence as recently as December 18, 2018.

53.    After departing **SUBJECT RESIDENCE 2**, your affiant drove to **SUBJECT RESIDENCE 1**. At approximately 4:27 pm, your affiant arrived at **SUBJECT RESIDENCE 1**, and observed all three **SUBJECT VEHICLES** parked in the driveway of the residence. Your affiant observed that SAUDIA was already sitting in the driver seat of **SUBJECT VEHICLE 2** upon my arrival. At approximately 4:29 pm, SAUDIA departed the residence in **SUBJECT VEHICLE 2**. At approximately 4:40 pm, your affiant departed the residence and drove to the MPO. At approximately 4:50 pm, your affiant arrived at the MPO and observed there was an entire cart filled with parcels that were nearly identical to others mailed in the investigation, sitting next to a retail clerk. Your affiant was advised by MPO staff, that a thin, African

20

American male just departed the MPO after mailing the parcels. Your affiant detained the 18 parcels (12 domestic and 6 international), for photographing and further inspection. Your affiant immediately conducted a review of the MPO surveillance video and observed at 4:18:22 pm, the mailer of the 18 parcels entered the MPO carrying a white trash bag filled with the parcels. Your affiant also observed on the surveillance video at nearly the same time, **SUBJECT VEHICLE 2** was observed departing the parking lot of the MPO (just nine minutes before your affiant observed SAUDIA in **SUBJECT VEHICLE 2** at **SUBJECT RESIDENCE 1**). During the review of surveillance video, your affiant noted the mailer of the parcels was the same unidentified African American male that mailed the undercover marijuana buy parcel from the Merced Raley's on December 19, 2018. The transaction was conducted utilizing cash and the sender name listed on the 18 parcels was Tony Williams, a common name observed on parcels throughout this investigation. Following the photo documentation of the 18 parcels, they were placed back into the mail stream.

54.     While at the MPO, your affiant conducted an interview with USPS Retail Clerk concerning the investigation. The clerk advised the same African American man and woman have been mailing the same domestic and international parcels from the MPO for well over a year. The clerk advised he/she has talked with them many times over the year, and always suspected the parcels they were mailing contained illegal substances, due to the return address they originally used, belonged to someone besides them. The clerk advised he/she did not know the name of the female, but advised the male subject went by the name "Travis Mathis". The clerk advised the couple always used to mail their own parcels, until approximately 6 months ago, a bunch of the parcels began getting "Returned to Sender", but since the sender address wasn't their real address, it caused problems. The clerk advised at about that time, the couple stopped coming into the MPO to mail parcels, and instead of them, the last six months the parcels keep getting mailed but from different people all the time. The clerk advised stated she knows the parcels still belong to them because the handwriting on the parcels still being mailed today, is the same handwriting from the last year or more. The clerk advised he/she knows the

21

handwriting is that of the male because he used to always fill out the labels while he was within the actual post office. The clerk advised she has talked with the male and female couple dozens of times over the last year plus, and observed him complete labels on the parcels on many occasions. Your affiant asked the clerk if she/he believed she/he would be able to recognize the male and female couple she was speaking of and she said unequivocally, yes. Your affiant showed the clerk a DMV photo of SAUDIA MONSON and the clerk advised that was the female half of the couple she has been speaking of. Your affiant showed a DMV photo of JABARI MONSON and the clerk advised that was the male half of the couple he/she has been speaking of, that used to fill out the parcels and he/she knew by the name "Travis Mathis". Your affiant asked when the last time he/she saw SAUDIA or JABARI and she advised it had been approximately 2-3 months. The clerk advised it wasn't because they mailed, but they occasionally come into the lobby to pick up free boxes and mailing supplies. Lastly, the clerk advised he/she knows the couple also mail parcels at the other Post Office in Merced, located at 415A W.18th St, Merced, CA 95340, because he/she occasionally fills in at the post office and has seen them mail there in the past.

## VI.    SEARCH OF DIGITAL INFORMATION

55.    Your affiant is aware that vendors of narcotics on the Internet use a computers, including smart phones, to access the web and conduct narcotic sales. Your affiant is also aware that individuals must use an electronic device to locate and communicate with bitcoin exchangers and purchase bitcoins. Users of bitcoin must establish electronic wallets to receive and send bitcoins. These wallets are electronic in nature and may be stored on mobile devices (phones or tablets), external or removable media, and/or computers. Your affiant is aware that once contact is made with a bitcoin exchanger on a digital currency exchange platform, all subsequent contact and transactions can be conducted from one phone to the other during a face to face transaction, exchanging currency for bitcoins. Your affiant is also aware that users can back-up wallets to paper printouts that would contain information to restore the wallet in an

22

electronic form (cold storage).  Passwords for access electronic wallets, are typically complex

and are often written down or saved in an accessible manner on paper or on some electronic

device. There is probable cause to believe that such items are located in **SUBJECT**

**RESIDENCES 1 and 2**, in **SUBJECT VEHICLES 1, 2, and 3**, and on the persons of SAUDIA

and JABARI.

56.     As described above and in Attachment B, your affiant submits that computers,

smart phones, and possibly other storage media will likely be found within **SUBJECT**

**RESIDENCES 1 and 2**, in **SUBJECT VEHICLES 1, 2, and 3**, and on the persons of SAUDIA

and JABARI, and there is probable cause to search and seize those items for the reasons stated

below.  Some of these electronic records might take the form of files, documents, and other data

that is user-generated.  Some of these electronic records, as explained below, might take a form

that becomes meaningful only upon forensic analysis.  Furthermore, your affiant submits that

sufficient probable cause has been established to search and seize any online digital currency

exchange platform accounts, and the data contained therein, located on seized digital devices.

57.     For example, based on my knowledge, training, and experience, your affiant is

aware that a powered-on computer maintains volatile data.  Volatile data can be defined as active

information temporarily reflecting a computer's current state including registers, caches, physical

and virtual memory, network connections, network shares, running processes, disks (floppy, tape

and/or CD-ROM), and printing activity. Collected volatile data may contain such information as

opened files, connections to other computers, passwords used for encryption, the presence of

anti-forensic tools, or the presence of programs loaded in memory that would otherwise go

unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is

powered-off and unplugged.

58.     Based on my knowledge, training, and experience, your affiant knows that

computer files or remnants of such files can be recovered months or even years after they have

been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files

downloaded to a storage medium can be stored for years at little to no cost.  Even when files

have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

59.     Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

60.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

61.     Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

62.     In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds.  Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet.  The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

63.     Similarly, files related to the purchasing and selling of controlled substances, as well as, the movement of currency found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache".  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

64.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For

example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

65.     Searching the computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

66.     Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of

the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

67.     The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

68.     The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

69.     Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data

on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

70.     Variety of forms of electronic media:  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

71.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VII.     REQUEST FOR SEALING

72.     I request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of USPIS, HSI, DEA, and FBI, and federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.

73.     Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.  Sealing these documents will also better ensure the safety of agents and others.

## VIII.   CONCLUSION

74.    Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance) are concealed in the locations identified in Attachment A-1, A-2, A-3, A-4, and A-5. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the locations described in Attachments A-1, A-2, A-3, A-4, and A-5, as well as the seizure of items described in Attachment B.

75.    Furthermore, I believe that there is probable cause that JABARI MONSON and SAUDIA LATIQUE MONSON committed those same crimes, thus supporting the legal basis for the Court to issue an arrest warrant based on a criminal complaint.

Respectfully submitted,

Jason Bauwens
United States Postal Inspector

Approved as to form:

Grant Rabenn
Assistant United States Attorney

Sworn and Subscribed to me on January ⁄5 2019

Hon. Edmund F. Brennan
United States Magistrate Judge
Eastern District of California

## ATTACHMENT A-1

The **SUBJECT RESIDENCE** 1 to be searched pursuant to the requested search warrant is described as follow:

### The residence located at 2795 Midge Avenue, Merced, CA 95340

The residence is further described as a single family residence, which is a corner lot located at the corner of Midge Avenue and Agnes Court. The residence is an approximately 1,500 sq. ft, single story residence which is light gray in color, stucco construction, with white trim and a brown shingle roof. There is a standard two car garage door that is white in color, which faces Midge Avenue. As you face the residence, to the right of the garage door are the black colored numbers "2795" affixed to the house at a 45 degree upward angle. Immediately to the right of the house numbers is a black mailbox affixed to the house. Immediately to the right of the mailbox is the front door, which contains a white security screen door. The rear and portions of the sides of residence are surrounded by an approximately six foot tall, wooden privacy fence.

The search is to include:

ANY AND ALL locked or closed rooms, closets, safes, cabinets, hidden compartments or storage facilities.

The following is a photograph taken by case agents during drive by surveillance showing the front of the residence:



## ATTACHMENT A-2

The **SUBJECT RESIDENCE 2** to be searched pursuant to the requested search warrant is described as follow:

### The residence located at 189 South G Street, Merced, CA 95341

The residence is further described as a single family residence, which is a corner lot located at the corner of South G Street and West Sugarbird Court. The residence is an approximately 1,000 sq. ft, single story residence with brown wood siding, with white trim and a reddish/brown shingle roof. The front door of the residence is white in color and faces South G Street. There is a white, single car attached garage that faces West Sugarbird Court, with an accompanying concrete driveway that connects to West Sugarbird Court. The rear and portions of the sides of residence are surrounded by an approximately six foot tall, wooden privacy fence. There are no house numbers visible on the residence; however numerous open source internet searches revealed numerous images of the same residence, which previously bore black vertical numbers "189" on a post near the front door of the residence. The numbers are no longer present on the post.

The search is to include:

ANY AND ALL locked or closed safes, glove boxes, hidden compartments or storage facilities in the vehicle.

The following is a photograph taken by case agents during drive by surveillance showing the residence:



## ATTACHMENT A-3

The **SUBJECT VEHICLE 1** to be searched pursuant to the requested search warrant is described as follow:

### A Gold 2005 BMW X5 SUV bearing Texas temporary paper license plate 873407F

### Vehicle Identification Number 5UXFA13515LY14036

The search is to include:

ANY AND ALL locked or closed safes, glove boxes, hidden compartments or storage facilities in the vehicle.

The following is a photograph taken by case agents during drive by surveillance showing the vehicle:



## ATTACHMENT A-4

The **SUBJECT VEHICLE 2** to be searched pursuant to the requested search warrant is described as follow:

**A white 4 door, newer model Honda Accord bearing a white and blue "Merced Honda" paper plate and a silver "Merced Honda" license plate frame**

The search is to include:

ANY AND ALL locked or closed safes, glove boxes, hidden compartments or storage facilities in the vehicle.

The following is a photograph taken by case agents during drive by surveillance showing the vehicle:



## ATTACHMENT A-5

The **SUBJECT VEHICLE 3** to be searched pursuant to the requested search warrant is described as follow:

### A Black 2006 four door Dodge Charger Texas temporary paper plate 990329F

### Vehicle Identification Number 2B3KA43R26H188369

The search is to include:

ANY AND ALL locked or closed safes, glove boxes, hidden compartments or storage facilities in the vehicle.

The following is a photograph taken by case agents during drive by surveillance showing the vehicle:



## ATTACHMENT B
## ITEMS TO BE SEIZED

The following records, documents, files, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as computers, hard drives, flash drives, tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute or contain evidence, instrumentalities, or fruits of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance) and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance):

1.      All records relating to the violations described above, including:

        a.      any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of controlled substances;

        b.      any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of packaging materials;

        c.      any and all documents, records or information relating to the purchase, sale, tracking, delivery or distribution of postage or express mail consignment;

        d.      any and all documents, records or information relating to the transfer, purchase, sale or disposition of virtual currency;

        e.      any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (Tor-based) services;

        f.      any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

        g.      any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals.

h.      any and all records relating to indicia of occupancy, residency, and ownership or use of the locations described in Attachments A-1, A-2, A-3, A-4 and A-5, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents, and keys;

i.      any and all records of any address and/or telephone books, rolodex indicia, electronic organizers, telephone paging devices and the memory thereof, and any papers, records or electronic data reflecting names, addresses, telephone numbers, pager numbers of co-conspirators, sources of controlled substances and/or virtual currency, identifying information for customers purchasing controlled substances and/or virtual currency;

j.      all bank records, checks, credit card bills, account information, safe deposit box information and other financial records;

k.      all copies of income tax returns filed with the Internal Revenue Service (IRS) or the California Franchise Tax Board;

l.      all records related to the purchase of real estate or other assets, or the leasing of storage units,

m.      financial records for SAUDIA MONSON AND JABARI MONSON, including foreign and domestic banking records, ledger books, wire transfer instructions, and receipts for wire transfers,

n.      bulk cash in excess of $1,000.

2.      Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

a.      any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

b.      any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c.      any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical

disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

     d.    any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

     e.    any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

     f.    any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

     g.    any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.


3.    For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

     a.    evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

     b.    evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.    evidence of the lack of such malicious software;

     d.    evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

     e.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

     f.    evidence of the times the digital device or other electronic storage media was used;

g.      passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

h.      documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i.      contextual information necessary to understand the evidence described in this attachment.

4.      Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a.      routers, modems, and network equipment used to connect computers to the internet;

b.      records of Internet Protocol addresses used;

c.      records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

5.      Any and all encrypted chat applications used in furtherance of the offenses described above.

6.      Any and all peer to peer (P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above.

7.      Virtual currency in any format, including but not limited to, wallets (digital and paper), seed words, usernames and passwords, public keys (addresses) and private keys.

8.      Fiat currency (U.S. dollars or other government issued currency).

9.      Keys to storage units, suites, lockers and safe deposit boxes.

10.   Firearms or other prohibited weapons.

11.   Controlled substances and associated paraphernalia.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE
MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS
SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO
THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC
STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL
ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF
CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR
EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED
CRIME.